**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

_____

ASHLEY WHITE, LaMONTE WHITE,
RUDY G. SALAZAR, CRUZ DUARTE,
and AURORA CANO,

      Plaintiffs,

v.                                                                        Case No.: 2:25-cv-00035-JCH-DLM

MAVERICK NATURAL RESOURCES,
MATT HENNING, JASON PALOMBO,
PAUL HUTTO, WORKRISE TECHNOLOGIES,
INC., JOHN DOES 1-X, and BLACK AND
WHITE CORPORATIONS I-X,

      Defendants.

**MEMORANDUM OPINION AND ORDER ON DEFENDANTS'**
**MOTION TO COMPEL ARBITRATION AND PARTIAL MOTION TO DISMISS**

In their Second Amended Complaint, Plaintiffs LaMonte White and Cruz Duarte ("Maverick Plaintiffs") allege their former employer and supervisors—Defendants Maverick Natural Resources ("Maverick"), Matt Henning, Paul Hutto, and Jason Palombo (collectively, "Maverick Defendants")—unlawfully discriminated, harassed, and retaliated against them based on their race. *See generally* Doc. 4 ("SAC"). In opposition, Maverick Defendants dually filed a motion to compel arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, and a partial motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. 20 ("Motion"). The Court addresses only the merits of the motion to compel.

In their Motion, Maverick Defendants contend that both Maverick Plaintiffs signed written, valid, and enforceable arbitration agreements that require the parties to arbitrate the claims asserted in this case. *Id.* at 2, 5-9. Maverick Plaintiffs oppose, dispute the validity and enforceability of the arbitration agreements, and contend they are not bound by their terms. Doc. 23 at 3-7.

1

The Court, having considered the briefs, the relevant law, and being otherwise fully informed, concludes the arbitration agreements are enforceable. Therefore, the Court will grant Maverick Defendants' motion to compel. Doc. 20 at 5-9.

## BACKGROUND

Maverick is a private oil and natural gas development production company operating in southeastern New Mexico and west Texas. Doc. 4 at 5 ¶ 24. Maverick Plaintiffs worked for Maverick, though the record does not describe in what capacity. *Id.* ¶ 23. Henning, Hutto, and Palombo also worked for Maverick—the former was the area superintendent and the latter two were foremen. *Id.* at 4-5 ¶¶ 18-20.

As part of Maverick's hiring process in 2023, White and Duarte received and signed an arbitration agreement ("Agreement") which states, in pertinent part,

> In any organization, disputes sometimes arise that need to be resolved in a formal proceeding. In order to resolve any future disputes that may arise between you and [Maverick] without the costly expense and lengthy delays typically associated with court actions, you and [Maverick] agree to submit any Claims (as defined below) to final and binding arbitration before a neutral arbitrator, pursuant to the Federal Arbitration Act ("FAA"), and not to any court.

Doc. 20-6 at 2 (signed by Duarte); Doc. 20-7 at 2 (signed by White). Each Agreement defines "Covered Claims" as:

> Except for the types of claims listed in paragraph 2 below, you and [Maverick] agree to arbitrate any and all claims, disputes, demands, liabilities, debts, accounts, obligations, damages, compensatory damages, punitive damages, liquidated damages, costs, expenses, actions and causes of action arising out of or in connection with your employment with [Maverick] or the termination of your employment (including, but not limited to, any claims for or of wrongful discharge, breach of the covenant of good faith and fair dealing, private attorney general claims, tort, bad faith, breach of contract, wages, benefits, violations of any and all federal, state, or local civil rights laws, ordinances, regulations or orders, or discrimination or harassment on account of race, color, creed, religion, national or ethnic origin (including native language), ancestry, . . . or any other legally protected characteristic prohibited by such laws, ordinances, regulations or orders (including, but not limited to, Title VII of the Civil Rights Act of 1964, . . . Civil

Rights Act of 1866, Civil Rights Act of 1991, . . . and applicable state and local equal employment opportunity laws)) (collectively, "Claims").

Doc. 20-6 at 2 ¶ 1; Doc. 20-7 at 2 ¶ 1.

The Agreements also outline "Excluded Claims," which are not subject to mandatory arbitration. These provisions provide:

> To the extent required by law, any claims for workers compensation insurance, unemployment insurance, and any matter within the jurisdiction of the state labor commissioner are not covered by this Agreement. This Agreement does not prohibit you from filing an administrative charge or complaint of discrimination or harassment with either the Equal Employment Opportunity Commission or any state or local equal employment opportunity agency. Except as provided in this paragraph 2, arbitration in accordance with this Agreement shall be the only method for resolving all Claims.

Doc. 20-6 at 1 ¶ 2; Doc. 20-7 at 1 ¶ 2. The same paragraph continues, cautioning the parties about the forfeiture of their right to a jury trial:

> By this Agreement, both you and [Maverick] are giving up any right to have a judge or jury decide any Claim, but either you or [Maverick] may request equitable relief, including, but not limited to, injunctive relief, from a court.

Doc. 20-6 at 2 ¶ 2; Doc. 20-7 at 2 ¶ 2. A similar warning is reiterated in bold, capitalized text on the last page of the Agreements:

> **THE COMPANY, BY PROVIDING THIS AGREEMENT TO YOU, AND YOU, BY YOUR SIGNATURE BELOW, AGREE TO ARBITRATE ALL CLAIMS COVERED BY THIS AGREEMENT. YOU ACKNOWLEDGE AND AGREE THAT YOU HAVE CAREFULLY READ THIS AGREEMENT, UNDERSTAND ITS TERMS, AND HAVE ENTERED INTO THIS AGREEMENT VOLUNTARILY.**
>
> **THE ARBITRATION PROVISIONS IN THIS AGREEMENT MEAN THAT BOTH YOU AND [MAVERICK] ARE GIVING UP ANY RIGHT TO A JUDGE OR JURY TRIAL WITH REGARD TO ALL CLAIMS CONCERNING EMPLOYMENT AND TERMINATION OF EMPLOYMENT, OTHER THAN AS SPECIFICALLY STATED IN THIS AGREEMENT.**

Doc. 20-6 at 3-4; Doc. 20-7 at 3-4. This is placed directly above the signature lines. Both Maverick Plaintiffs signed their respective Agreement in 2023. *See* Doc. 20-6 at 4 (signed December 19, 2023); Doc. 20-7 at 4 (signed January 3, 2023).

Then, in July 2024, Duarte and White each submitted a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), concerning Maverick Defendants' alleged conduct during their employment. *See generally* Doc. 20-2 (Duarte's Charge); Doc. 20-4 (White's Charge). Thereafter, in early 2025, Maverick Plaintiffs, Ashley White, Rudy Salazar, and Aurora Cano (collectively "Plaintiffs") sued, inter alia, Maverick Defendants and Workrise Technologies, Inc.[1] *See generally* Doc. 1. In their SAC, Plaintiffs allege Defendants unlawfully discriminated, harassed, and retaliated against them based on their race and sex in violation of both Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 of the Civil Rights Act of 1866. *See* Doc. 4 at 9-36. In response, Maverick Defendants point to the Agreements and move the Court to compel arbitration. Doc. 20 at 2, 5-9.

## DISCUSSION

Parties enter into arbitration agreements for a number of reasons—the most prominent being to expedite dispute resolution and minimize the considerable costs of litigating in federal court. *See Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 39 F.3d 1482, 1488-89 (10th Cir. 1994) ("[T]here is a strong federal policy encouraging the expeditious and inexpensive resolution of disputes through arbitration."). The Federal Arbitration Act ("FAA") favors arbitration and

---

[1] In its answer to the SAC, Ally Consulting, LLC ("Ally"), clarified that Plaintiffs incorrectly named Workrise Technologies, Inc., as a defendant instead of Ally. Doc. 19 at 1, 4 ¶ 20 ("Ally admits that it, not Workrise [ ], employed Plaintiffs Cano, Salazar, and Ashley White."). Apparently, Ally is a subsidiary of Workrise. *Id.* at 1. Though not pertinent to resolution of the Motion, the Court notes that all allegations against Workrise are construed as if made against Ally. *See id.* at 1 n.1. The Court will address Ally's motion to compel arbitration in a separate Memorandum Opinion and Order. *See generally* Doc. 27.

establishes, as a matter of federal law, that arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Recognizing this, the United States Supreme Court held that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). In this way, "[b]oth federal and New Mexico law reflect a public policy in favor of arbitration agreements." *Laurich v. Red Lobster Rests., LLC*, 295 F. Supp. 3d 1186, 1202 (D.N.M. 2017) (collecting cases).

While the FAA articulates a national policy in favor of arbitration, this presumption "disappears when the parties dispute the existence of a valid arbitration agreement." *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir. 2002). A legally enforceable contract must exist before parties will be forced to arbitration. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995). So, a court's "first task . . . is to determine whether the parties agreed to arbitrate [the] dispute." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). Procedurally, courts employ a burden-shifting framework similar to that of summary judgment. *Hancock v. AT&T Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012). Here, Maverick Defendants, as the movants, bear "the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement." *Bellman v. i3Carbon, LLC*, 563 F. App'x 608, 612 (10th Cir. 2014). If Maverick Defendants succeed, then Maverick Plaintiffs must "raise a genuine dispute of material fact regarding the existence of an agreement." *Id.* If no material facts are in dispute, then the Court may rule on the motion to compel. *See id.*

Once a court is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue," 9 U.S.C. § 4, it must determine whether the claims fall within the scope of the agreement.[2] *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299-300 (2010). Only then may a court enforce the agreement according to its terms. *See Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 183 (2019). Ultimately, the object is clear: "decide quickly— summarily—the proper venue for the case, whether it be the courtroom or the conference room, so the parties can get on with the merits of their dispute." *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 977 (10th Cir. 2014).

## I.    First Defense-to-Enforcement: Lack of Mutual Assent

It is undisputed New Mexico state-law principles guide the Court's threshold inquiry of contract formation. *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1287 (10th Cir. 1997). "For a contract to be legally valid and enforceable, it must be factually supported by an offer, an acceptance, consideration, and mutual assent." *Flemma v. Halliburton Energy Servs., Inc.*, 2013-NMSC-022, ¶ 28, 303 P.3d 814 (citation modified). To meet their initial burden and prove formation, Maverick points to the Agreements themselves.[3] Doc. 20 at 7-9.

---

[2] Maverick Plaintiffs implicitly concede that their causes of action fall within the scope of the Agreements. *See* Doc. 23 at 3-7 (disputing only the validity of the Agreements themselves). Indeed, the Agreements expressly provide that the parties would arbitrate "all claims, disputes, demands," and causes of action related to a "legally protected characteristic" such as those guarded by Title VII and the Civil Rights Act of 1866, which includes Section 1981. Doc. 20-6 at 2 ¶ 1; Doc. 20-7 at 2 ¶ 1. Maverick Plaintiffs sue Maverick Defendants under those statutes. Doc. 4 at 9-22, 33-36 (Counts I-V, IX). Thus, the second element necessary to compel arbitration is satisfied. *See Granite Rock Co.*, 561 U.S. at 299-300.

[3] It is undisputed Maverick presented both Duarte and White with the Agreements in 2023 and Maverick Plaintiffs both signed the documents in consideration of their employment. Doc. 20-6 at 4; Doc. 20-7 at 4. The parties also do not dispute that there was an offer and consideration. *See* Doc. 24 at 2. Accordingly, the Court does not discuss those aspects of contract formation.

In response, Maverick Plaintiffs argue the Agreements are invalid contracts because the parties never formed mutual assent. Doc. 23 at 3-5. Ordinarily, "[p]arties can be said to mutually assent to a contract when they have the same understanding of the contract's terms; where they attach materially different meanings to the terms, there is no meeting of the minds." *DeArmond v. Halliburton Energy Servs., Inc.*, 2003-NMCA-148, ¶ 20, 81 P.3d 573. To make this determination, the Court looks to "objective evidence, not the private, undisclosed thoughts of the parties." *Pope v. Gap, Inc.*, 1998-NMCA-103, ¶ 13, 961 P.2d 1283.

Maverick Plaintiffs home in on the second paragraph of the Agreements, arguing the language defining the Excluded Claims is "too ambiguous" and contradictory to support mutual assent. Doc. 23 at 4, 5. Specifically, they posit the Department of Workforce Solutions ("Department") has jurisdiction "over claims regarding human rights" and "investigates claims of discrimination based on race, color, [and] national origin." *Id.* at 4 (citation omitted). Maverick Plaintiffs suggest this asserted jurisdiction contradicts the Agreements' application to "all claims." *Id.* at 5.

Abiding by fundamental tenants of New Mexico contract law, the Court presumes Maverick Plaintiffs read the entirety of the Agreements, including the paragraphs defining the covered and excluded claims. *See Ballard v. Chavez*, 1994-NMSC-007, ¶ 8, 868 P.2d 646 ("[E]ach party to a contract has a duty to read and familiarize himself with the contents of the contract, each party generally is presumed to know the terms of the agreement, and each is ordinarily bound thereby."). The Agreements' first paragraph expressly states the parties would arbitrate "all claims, disputes, demands," and causes of action related to a "legally protected characteristic" such as those guarded by "Title VII of the Civil Rights Act of 1964 . . . [and] Civil Rights Act of 1866," including Section 1981. Doc. 20-6 at 2 ¶ 1; Doc. 20-7 at 2 ¶ 1. Then, the second paragraph

7

explicitly excepts "any claims for workers compensation insurance, unemployment insurance, and any matter within the jurisdiction of the state labor commissioner."[4] Doc. 20-6 at 2 ¶ 2; Doc. 20-7 at 2 ¶ 2. This provision continues, "This Agreement does not prohibit you from filing an administrative charge or complaint of discrimination" with the EEOC "or any state or local equal employment opportunity agency." Doc. 20-6 at 2 ¶ 2; Doc. 20-7 at 2 ¶ 2. Reading these paragraphs together, the Court finds that the language is clear and unambiguous. Maverick Plaintiffs bring multiple causes of action under both Title VII and Section 1981. *See* Doc. 4 at 9-22, 33-36. And, based on the record, there is no indication they sought to bring claims within the Department's purview. Moreover, Maverick Plaintiffs put forth no evidence supporting their interpretation of the Agreements. Their efforts to extricate these paragraphs are absent merit.

Furthermore, as the New Mexico Court of Appeals explained, "what is operative is the objective manifestations of mutual assent by the parties, not their secret intentions." *Pope*, 1998-NMCA-103, ¶ 13. While Maverick Plaintiffs claim to have attached a different meaning to the "ambiguous" language in the second paragraph, they took advantage of those very exceptions and filed Charges of Discrimiation with the EEOC. *See* Doc. 20-2 at 2-4; Doc. 20-4 at 2-4. Even drawing all inferences in favor of Maverick Plaintiffs, as the Court must, the record demonstrates the parties mutually assented to the contractual terms. *See Hancock*, 701 F.3d at 1261. The Court will not stymy enforcement of the Agreements based on Maverick Plaintiffs' secret reservations about the contractual terms they now protest but previously utilized to pursue extra-judicial relief.

---

[4] The Department is a New Mexico state agency and exists to adjudicate claims arising only under New Mexico law. *See* NMSA 1978, §§ 9-26-1 to -17 (the Workforce Solutions Department Act); NMSA 1978, § 9-26-2 (2007) (renaming the New Mexico Department of Labor as the New Mexico Department of Workforce Solutions). This would exclude Maverick Plaintiffs' federal claims.

The Court finds the terms of the Agreements were presented clearly and unambiguously. Therefore, the Court concludes the Agreements are supported by mutual assent and, hence, are valid contracts.

## II.    Second Defense-to-Enforcement: Unconscionability

Arbitration agreements, like other contracts, "may be invalidated by generally applicable contract defenses such as fraud, duress, or unconscionability." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010) (citation modified). Relying on the latter, Maverick Plaintiffs wish to usurp the very purpose of their arbitration agreements—to avoid litigation—by arguing unconscionability thwarts the Agreements' enforceability. Doc. 23 at 5-7.

Under New Mexico law, unconscionability is both "an affirmative defense to contract enforcement" and "an equitable doctrine, rooted in public policy, which allows courts to render unenforceable an agreement that is unreasonably favorable to one party while precluding a meaningful choice of the other party." *Strausberg v. Laurel Healthcare Providers, LLC*, 2013-NMSC-032, ¶¶ 3, 31, 304 P.3d 409 (citation modified). A contract can be procedurally or substantively unconscionable, or a combination of both. *Id.* ¶ 31. "Procedural unconscionability goes beyond the mere facial analysis of the contract" and concerns the "particular factual circumstances surrounding the formation of the contract." *Cordova v. World Fin. Corp. of N.M.*, 2009-NMSC-021, ¶ 23, 208 P.3d 901. Substantive unconscionability, on the other hand, "concerns the legality and fairness of the contractual terms themselves." *Id.* ¶ 22. The two work inversely. "The more substantively oppressive a contract term, the less procedural unconscionability may be required for a court to conclude that the offending term is unenforceable." *Id.* ¶ 24. Maverick Plaintiffs rely on both theories. *See* Doc. 23 at 5-7. As the party asserting unconscionability, they bear the burden of proof. *Strausberg*, 2013-NMSC-032, ¶ 3.

### A.      Procedural Unconscionability

To evaluate whether the Agreements are procedurally unconscionable, the Court considers the circumstances surrounding contract formation, "including the [parties'] relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other." *Cordova*, 2009-NMSC-021, ¶ 23. Other "indicia of procedural unconscionability" include:

> (1) a dominant party's use of high-pressure tactics; (2) the weaker party's need to accept the contract; (3) the relative scarcity of the subject matter of the contract; (4) the parties' relative education, sophistication, or wealth; (5) the absence of an opportunity for negotiation; and (6) the standardized form of the contract.

*Woodell v. Vivint, Inc.*, No. 22-CV-00733, 2023 WL 3956631, at *3 (D.N.M. June 12, 2023) (summarizing New Mexico Supreme Court cases). A district court should also consider whether the contract is one of adhesion, which is evidenced by an agreement satisfying the fourth, fifth, and sixth aforementioned indicia. *See id.*; *see also Griffin v. Vivint Solar, Inc.*, No. 1:21-CV-00138, 2021 WL 2186408, at *6 (D.N.M. May 28, 2021) (explaining an adhesion contract is "a standardized contract offered by a party with superior bargaining strength to a weaker party on a take-it-or-leave-it basis, without opportunity for bargaining").

Maverick Plaintiffs contend the disparity in the parties' bargaining power, combined with "sign[ing] their names and initials numerous times," proved too much and precluded them from freely accepting or declining the proposed contractual terms. Doc. 23 at 6. While Maverick Plaintiffs do not expound upon the details of the parties' relative bargaining authority, the Court agrees that Maverick—as a large corporation—compared to Maverick Plaintiffs—as individuals— operated from an advantageous negotiating position. Maverick also presented the Agreements amongst a multitude of documents, all of which were offered in consideration of Maverick Plaintiffs' prospective employment. *See id.* Undoubtedly, Maverick Plaintiffs wished to be

employed by Maverick and were signing the Agreements in pursuit of that goal. Accordingly, the Court assumes the Agreements may have been presented on a "take it or leave it" basis, which, in turn, may have created contemporaneous pressure to sign.

As to formatting, the Agreements are form contracts written by Maverick without Maverick Plaintiffs' input or negotiation. *See id.* (stating the Agreements were "standardized, pre-printed form[s]"). There is nothing otherwise unusual about the Agreements' text, font, or density. Considering these circumstances, the Agreements resemble adhesion contracts. Yet, when combined, the Agreements' likely statuses as adhesion contracts and the parties' purported unequal bargaining power, are insufficient to prove procedural unconscionability. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (1991) ("Mere inequality in bargaining power, however, is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context."); *Woodell*, 2023 WL 3956631, at *3 ("[A]n agreement's status as an adhesion contract is insufficient to prove procedural unconscionability."); *id.* at *4 ("[A] contract may be enforceable despite its fine print."). The Court turns to the remaining indicia of procedural unconscionability.

In doing so, the Court concludes procedural unconscionability did not pervade the parties' contract formation. Maverick Plaintiffs do not explicate what may have compelled their acquiescence to the Agreements nor have they proffered whether alternative employment opportunities were scarce. Maverick Plaintiffs also do not provide much background information in the way of the parties' transactions or any influential tactics Maverick deployed.

Lastly, the undisputed appearance of Maverick Plaintiffs' signatures on both contracts belies any argument they lacked the opportunity to read or ask questions about the Agreements or the terms. *See, e.g.*, *Griffin*, 2021 WL 2186408, at *7 ("[A] party who executes and enters a written

11

contract is presumed to know the terms of the agreement and to have agreed to each of its provisions in the absence of fraud, misrepresentation, or some other wrongful act." (citing *Smith v. Price's Creameries, Div. of Creamland Dairies, Inc.*, 1982-NMSC-102, ¶ 13, 650 P.2d 825)). The Agreements provide that Maverick Plaintiffs and Maverick arranged "to submit any Claims . . . to final and binding arbitration before a neutral arbitrator, pursuant to the [FAA], and not to any court." Doc. 20-6 at 2; Doc. 20-7 at 2. A similar sentiment is repeated and prominently displayed in bold, capital letters above the signature lines. Doc. 20-6 at 3-4; Doc. 20-7 at 3-4. The record does not demonstrate, and Maverick Plaintiffs do not argue, that either Maverick Plaintiff expressed confusion with, or sought clarification of, the terms.

Thus, based on the circumstances surrounding contract formation and the lack of evidentiary support by Maverick Plaintiffs, the Court cannot find there was procedural unconscionability. In all, the Court requires a stronger factual basis to move from analyzing asserted pressure to holding it existed and was unconscionable. Ultimately, Maverick Plaintiffs have not met their burden.

### B.    Substantive Unconscionability

The Court turns to Maverick Plaintiffs' invocation of substantive unconscionability. This requires the Court to assess "the legality and fairness of the contract terms themselves," and consider "whether the contract terms are commercially reasonable and fair, the purpose and effect of the terms, the one-sidedness of the terms, and other similar public policy concerns." *Rivera v. Am. Gen. Fin. Servs., Inc.*, 2011-NMSC-033, ¶ 45, 259 F.3d 803 (citation modified). Particularly one-sided terms are problematic. *See Cordova*, 2009-NMSC-021, ¶¶ 22, 25. Maverick Plaintiffs offer a short argument, asserting the Agreements are "grossly unfair and contrary to public policy"

because of their format and the waiver of their right to a jury trial. Doc. 23 at 7. This implies the Agreements do not similarly constrain Maverick. That is not the case.

As demonstrated by the pertinent language, the rights forfeited by the parties are mutual. Both Maverick and Maverick Plaintiffs agreed to arbitrate the covered claims. Specifically, the first page of the Agreements provides, in pertinent part, "[Y]ou and the Company agree to submit any Claims (as defined below) to final and binding arbitration . . . and not to any court." Doc. 20-6 at 2 ¶ 1; Doc. 20-7 at 2 ¶ 1. Later in the Agreements, Maverick Plaintiffs' signatures appear directly after this language:

> THE ARBITRATION PROVISIONS IN THIS AGREEMENT MEAN THAT BOTH YOU AND THE COMPANY ARE GIVING UP ANY RIGHT TO A JUDGE OR JURY TRIAL WITH REGARD TO ALL CLAIMS CONCERNING EMPLOYMENT AND TERMINATION OF EMPLOYMENT, OTHER THAN AS SPECIFICALLY STATED IN THIS AGREEMENT.

Doc. 20-6 at 3-4 (emphasis removed); Doc. 20-7 at 3-4 (same). It is clear, each party agreed to waive their right to proceed to file a case, let alone proceed to trial. This is in direct contrast to the cases Maverick Plaintiffs cite for support.

In both *Cordova* and *Rivera*, one party exclusively retained the ability to pursue judicial remedies while the other was forced to only arbitrate. *See Cordova*, 2009-NMSC-021, ¶¶ 3-4, 20 (holding a unilateral arbitration clause was "grossly unreasonable" because it reserved the lender's right to pursue litigation while binding the plaintiff-borrower to mandatory arbitration); *Rivera*, 2011-NMSC-033, ¶¶ 3, 54 (concluding the arbitration provision was unreasonably one-sided because the lender "retained the right to obtain through the judicial system the only remedies it was likely to need," while "forcing [the borrower] to arbitrate any claim she may have" through an arbitration carve-out applicable only to the lender). The Court has not found, and Maverick Plaintiffs did not provide, any contractual terms that operate to allow for a different outcome for

Maverick Plaintiffs on one hand and Maverick on the other. Maverick Plaintiffs' argument decrying the loss of a jury trial and reliance on this case law is misplaced.

Consequently, Maverick Plaintiffs have not met their burden to prove the Agreements are substantively unconscionable. Therefore, there is no genuine dispute of material fact regarding the enforceability of the Agreements. *See Bellman*, 563 F. App'x at 612. Given that the Agreements are valid and enforceable contracts, the Court will compel arbitration in accordance with their terms. *See Lamps Plus*, 587 U.S. at 178.

## CONCLUSION

Based on the foregoing, it is hereby ordered that Maverick Defendants' Motion is granted in part and denied in part. *See generally* Doc. 20. Specifically, the Court hereby orders that Maverick Defendants' motion to compel arbitration is granted, *id.* at 5-9, and the partial motion to dismiss is denied without prejudice. *Id.* at 10-12.

It is further ordered, pursuant to 9 U.S.C. § 3 of the FAA, this matter is stayed during the pendency of the arbitration process. *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding.").

Six-months after the issuance of this Memorandum Opinion and Order, Maverick and Maverick Plaintiffs shall file a joint status report advising the Court and the other parties of the status of the arbitration proceedings.

_____
SENIOR UNITED STATES DISTRICT JUDGE